CHEHARDY, Judge.
Plaintiff, United States Daughters of 1812 — Chalmette Chapter (Daughters), appeal a trial court judgment maintaining the exception of no cause of action filed on behalf of the defendants, Louisiana Department of Culture, Recreation and Tourism and The Louisiana State Museum, dismissing plaintiff’s suit for a declaratory judgment and decreeing that each party bear its own costs.
On October 4, 1921, the State of Louisiana acquired from the Daughters an immovable known as the Jackson House, which is situated in the French Quarter in New Orleans. The authentic act evidencing the sale of the property from plaintiff to defendants, also states:
“This sale is made and accepted for and in consideration of the price and sum of Three thousand, Two Hundred and Fifty Dollars, the assumption hereinafter referred to, and the other obligations of the purchaser as herein set forth, and to represent said purchase price the said Mrs. *457 Bankston acknowledges to have received for said Corporation the sum of Two Hundred and Fifty Dollars in cash, and bonds amounting to Three thousand Dollars, described as follows:
Three bonds of par value of $1000.00 each, being Nos. 9015-9016-9017 Northern Pacific Joint 15 year 614% Gold Bonds due July 1, 1936.
“And said Board further agrees to furnish free of charge to the said United States Daughters of 1776 and 1812 while they occupy the lower floor of said property, the use thereof being retained by them as long as they have corporate existence, the necessary current for electric light and when a heating system is installed by said Board, the necessary connections made, and also Janitor service.
“And as a further consideration of said sale, the Board of Curators of the State Museum hereby agrees to give to the United States Daughters of 1776 and 1812, the use of the ground floor of the premises herein conveyed, said use to continue as long as the said Association shall continue its corporate existence, and shall desire to continue to occupy the said premises, subject however, to the condition that no stoves, fires, or other elements liable to increase the fire hazard, shall be used in the said building for cooking purposes, and if the said Board of Curators shall provide a heating system, then none other shall be used for heating purposes; and the said United States Daughters of 1776 and 1812 shall put nothing in the said premises which shall increase the fire hazard; that it shall not use the said premises for other purposes than the exhibition of historic, art and literary objects and especially those pertaining to the wars of 1776 and 1812, and for its meetings, conventions and entertainments.
“It is also agreed that in the event of the destruction of the said premises by a fortuitous event, or for reconstruction, improvement or other purposes, the said Board of Curators shall afford said United States Daughters of 1776 and 1812, meeting and exhibition rooms in the State Museum of equal size and facilities; but no reconstruction or improvement, the effect of which shall be to deprive said United States Daughters of 1776 and 1812 of the permanent right of use herein given, shall be made without their consent, and in any improved or reconstructed building they shall be entitled to the use of rooms equally as suitable for their purposes as herein set forth as the ones now existing.
“It is furthermore agreed that a continued violation of the conditions of the use herein granted for a period of ninety (90) days, after being put in default by the Board of Curators, aforesaid, shall constitute an annullment of the use herein granted.” (Emphasis ours.)
That State now argues that it agreed to give the Daughters a “usufruct” or a “use” as meant in the legal sense, in connection with the first floor of the Jackson House and that since the Daughters are a corporation, and uses or usufructs in favor of corporations are limited to a period of 30 years by LSA-C.C. art. 612, the use or usufruct granted in favor of the Daughters is now expired. The Daughters, on the other hand, argue that the rights granted to them in the authentic act transferring the property are not ones which attach to the property itself, such as a legal use or usufruct, but, rather, represent a contractual obligation on the part of the State.
In the case of Crow v. Monsell, 200 So.2d 700 (La.App.2d Cir. 1967), the court addressed itself to the interpretation of written contracts at pages 701-702:
“A cardinal rule for the interpretation of contracts is that courts must seek for and ascertain, if possible, the mutual intention of the parties. LSA-C.C. Art. 1945; Cooley v. Meridian Lumber Co., 195 La. 631, 197 So. 255 (1940); Chicago Mill & Lumber Co. v. Lewis (La.App.) 68 So.2d 913 (2d Cir. 1953 — cert. denied). Although language employed in contracts is usually interpreted according to the ordinary and customary meaning of the words used, clauses couched in general terms, which, if taken literally, would *458 lead to unreasonable consequences must be construed according to what, under all circumstances, was probably the intention of the parties. Losecco v. Gregory, 108 La. 648, 32 So. 985 (1901); Molero v. California Company (La.App.) 145 So.2d 602 (4th Cir. 1962 — cert. denied). Where the words of a contract are susceptible of more than one meaning, courts must give them the interpretation that carries out the object and purpose of the contract. Robbert v. Equitable Life Assur. Soc., 217 La. 325, 46 So.2d 286 (1950). Even where the words used in a contract are fairly explicit, it is the duty of the courts to refrain from construing them in such a manner as to lead to absurd consequences. LSA-C.C. Art. 1945; Texaco, Inc. v. Vermilion Parish School Board, 244 La. 408, 152 So.2d 541 (1963); Bondio v. Joseph Binder, Inc., (La.App.) 24 So.2d 398 (Orl.1946).”
Furthermore, in Bohm v. CIT Financial Services, Inc., 348 So.2d 132, 134 (La.App. 1st Cir. 1977), writ refused October 7, 1977, the court also held:
“If the agreement between the parties is clear and unambiguous, and will not lead to absurd consequences, the intention of the parties must be gathered from the writing itself. It is only where the agreement is unclear, ambiguous or will lead to absurd consequences that the court should go beyond the written agreement to gather the true intention. * * * ”
Regarding contractual and testamentary interpretation concerning the presence of a usufruct, A. N. Yiannopoulas, Professor of Law, Louisiana State University, also states in his Louisiana Civil Law Treatise, Volume 3, on Personal Servitudes (1968):
“Testators and parties to contracts do not always take care to designate by its proper name the type of right they intend to create. Thus, whenever descriptive language is used, questions arise as to whether a usufruct or another right of enjoyment has been intended. Further, in mortis causa dispositions, questions arise as to whether a permissible disposition of usufruct and naked ownership has been intended or a reprobated substitution.
“These are matters of testamentary or of contractual interpretation governed by the general rules of construction of juridical acts. In general, ‘precise, technical terms are not necessary to create a usu-fruct.’ For example, a quitclaim deed authorizing one ‘to use, without cost, the surface of the south 840 feet’ of a tract of land, a reservation that the donor of property should ‘have and control said property during his lifetime, collecting and disbursing all income ... as may seem just and right to him’, a provision in a will that the named beneficiary should ‘receive all the rents, benefits, and emoluments’ of property, and a contract styled ‘emphyteusis’, have been held to create usufructs. The testator or the parties to the contract may even use common law terminology to describe the function of the right of usufruct they intend to create and still validly establish a usufruct under the civil law. On the other hand, use of the word ‘usufruct’ may not be determinative in the presence of dispositions irreconcilable with the notion of usufruct. And, when the word ‘usufruct’ is used in a will, oral testimony to prove that the testator intended to bequeath ‘ownership’ is admissible if the will is ambiguous.” (Emphasis ours.) Usu-fruct; General Principles, Ch. 1, § 13.
In the present case, therefore, this court holds that the trial court was justified, as is this court, in going beyond the written agreement in order to determine the true intent of the parties regarding the rights of the Daughters to use of the lower floor of the Jackson House. This court also has looked to the applicable articles of the Louisiana Civil Code in effect at the time of the contract in order to aid us in determining their intent and to assist us in properly characterizing the rights which were granted to the Daughters in connection with the Jackson House.
LSA-C.C. art. 533 states:
“Usufruct is the right of enjoying a thing, the property of which is vested in *459 another, and to draw from the same all the profit, utility and advantages which it may produce, provided it be without altering the substance of the thing.
“The obligation of not altering the substance of the thing takes place only in the case of perfect usufruct.” (Emphasis ours.)
LSA-C.C. art. 544 also states:
' “All kinds of fruits, natural, cultivated or civil, produced, during the existence of the usufruct, by the things subject to it, belong to the usufructuary.”
LSA-C.C. art. 548 further provides:
“The usufruct of a house carries with it the enjoyment of the house, of the profits which it may bring, and indeed of such furniture as is permanently fixed therein, even should the title by which the usu-fruct is established make no mention of the same.”
In the Treatise on the Civil Law, Volume 1, Part 2, Twelfth Edition (1939), as translated by the Louisiana State Law Institute, Marcel Planiol said, at Section 2778, regarding the importance of the usufruct’s right to the fruits under the French Civil Code:
“The right to the fruits is the principal prerogative vested in the usufructuary. It is this that characterizes the usufructu-ary. It is this that differentiates him from the user. The usufructuary very often restricts himself to receiving the fruits. He does not take physical possession of the thing. It remains in the hands of a tenant. Thus the Romans, to abbreviate, spoke of the lfructuarius ’ when referring to the usufructuary. The French language does not permit such abbreviations.” (Emphasis ours.)
A reading of the contract in the present case certainly reveals no rights granted to the Daughters in regard to any profits which might be generated by the Jackson House or to any other “advantage” which might be “produced” in connection with that entity. LSA-C.C. arts. 544 and 548, moreover, reiterate the usufruct’s right to all natural, cultivated or civil “fruits” produced by the property as well as any profits which it may bring, but it is obvious that the subject contract is totally devoid of any such rights having been granted in the Daughters’ favor, nor does the record of testimony reveal that plaintiff at any time received such fruits.
LSA-C.C. art. 555 articulates:
“The usufructuary may enjoy by himself or lease to another, or even sell or give away his right; but all the contracts or agreements which he makes in this respect, whatever duration he may have intended to give them, cease of right at the expiration of the usufruct.”
On examination, once again the contract in question reveals no intent on the part of the parties that the rights of the Daughters should be transferable, a privilege which, if present, would indicate that the Daughters’ occupancy of Jackson House should properly be characterized a usufruct.
LSA-C.C. art. 571 reads:
“The usufructuary is bound to make such repairs only as are indispensably necessary for keeping the estate subject to the usufruct in good order.
“Repairs extraordinary are to be made by the owner himself, unless such repairs have become necessary in consequence of the usufructuary’s neglect to make the repairs for keeping the property in good order, since the usufruct has been acquired by him, in which case the usufruc-tuary is bound to make such extraordinary repairs.”
It is also interesting to note the comments of Planiol in the Treatise, supra, regarding obligations of taxes and repairs under the French Civil Code:
“Taxes of all kinds collected by the State, the land tax with the additional centimes due the Departments or the Commune, as well as all other taxes imposed upon real estate, such as the Parisian sweeping tax and taxes on horses, carriages, billards, etc., are all charges incumbent upon the usufructuary (Art. 608). Within this category may also be placed certain expenses, which while not having the regularity of annual taxes, are nevertheless ‘charges on the fruits’, to use *460 the language of Art. 608. Examples of this category are the housing of troops that pass through and the clearing of small water ways.” Taxes, Section 2820.
“Repairs known as upkeep are distinguished from heavy repairs. The former devolve upon the usufructuary (Art. 605), because everybody pays for them out of income. Heavy repairs are drawn from capital.
“To avoid all contestations, the law took the precaution of setting forth in Art. 606 the repairs that should be deemed to be heavy repairs. And it adds: ‘all other repairs are upkeep.’ The idea was a good one. Unfortunately, the law envisaged solely usufructs established on constructions. It says nothing about repairs that may become necessary to ships, machines and the machinery of a factory, etc. A question of fact would then arise. In construing it regard should be had to the spirit of the law. Such repairs as consist in the remaking of an important part and which form an exceptional expense for the owner, may be deemed to be heavy repairs (Paris, Jan. 5, 1905, D. 1905. 2. 23; Paris, June 7, 1926, Gazette du Palais, July 8).” Repairs of Upkeep, Section 2821.
No mention is made in the subject contract of obligations on the part of either party regarding taxes and repairs, the implication being, therefore, that no responsibilities whatsoever in those regards were imposed upon the Daughters. Furthermore, the record of testimony does not reveal that the Daughters ever, at any time, paid any taxes on Jackson House or caused any repairs to be made there.
Regarding the expiration of a usufruct, LSA-C.C. art. 613 states:
“The usufruct expires before the death of the usufructuary, by the loss, extinction or destruction of the thing subject to the usufruct.
“Thus, the usufruct, which is established upon a building, expires, if the building is destroyed by fire or any other accident, or if it falls down through the decay of years.
“In this case the usufructuary would not even have the usufruct of the materials of the building, nor of the place in which it stood; for the usufruct is to be restrained to what is specified in the title. But if the usufruct be assigned upon an estate of which the building is a part, the usufructuary shall enjoy both the soil and the materials.”
Contrary to the provisions of the above article, however, the contract in the present case expressly provides that in the event of destruction of the premises of Jackson House the State agrees to provide the Daughters “meeting and exhibition rooms in the State Museum of equal size and facilities,” a provision which also tends toward characterization of the Daughters’ rights as something other than a usufruct on the Jackson House.
LSA-C.C. art. 605 also states:
“The owner may mortgage, sell or alienate the thing subject to the usufruct, without the consent of the usufructuary, but he is prohibited from doing it in such circumstances, and under such conditions as may be injurious to the enjoyment of the usufructuary.”
In the subject contract there is no mention of continuance of the Daughters’ rights, in regard to the property itself or in regard to the State, in the event of sale of property, a factor which, once again, if present, would tend to indicate that the nature of their rights was one of usufruct.
This court can only conclude, therefore, after analysis of the above articles, as a whole, in conjunction with the cited civil law treatises, that the contract between the State and the Daughters did not create a usufruct on the Jackson House, and, therefore, LSA-C.C. art. 612 is inapplicable to the obligations created by the contract.
We agree with appellant’s statement in its supplemental brief that there is involved, here not a real right but a personal right. The obligation, as stated supra, is a contractual one which should be governed by rules of contract law. Yiannopoulas, Louisiana Civil Law Treatise, supra.
*461 In this regard, plaintiff notes in its supplemental brief, and we agree:
“The public policy underlying the Article of the Code of 1870 limiting the Usu-fruct granted to congregations and certain corporations which are deemed perpetual to thirty (30) years seems to be to prevent the removal of real estate from commerce. That is explained in the case cited on Page 3 of the State’s supplemental brief, Female Orphan Society v. Young Men's Christian Association, 119 La., 279, 44 So. 15, which was decided by the Supreme Court in 1907. Of course, there is no question that in the Female Orphan Society case the Court was dealing with a Usufruct and nothing else. However, such does not apply to the case at Bar because Daughters do not claim a real right affecting The Jackson House. Daughter’s claims are against the State on a personal obligation and no manner of attempting to divert the Court’s attention from those personal obligations will defeat them. The supplemental brief is, in reality, simply a restatement of the State’s original brief. The State cannot deviate from the sole argument that the only rights the Daughters have against the State are real rights rather than personal rights and they continue to beg the question. Your Honors want to know in what manner the Authentic Act between Daughters and State constitutes only a Usufruct and the other provisions of the contract the obligations of the State solemnly undertaken are null and void. There is no explanation in either of the State’s briefs that supports such a contention. Obligations of parties to a contract constitute the law between those parties and they are not easily abrogated.”
The State also argues, in the alternative, that the rights granted to the Daughters can be characterized as a “use” or “habitation.” It further argues that, because LSA-C.C. art. 628 provides that the rights of use and habitation are to be established and extinguished in the same manner as usufruct, the 30-year limitation on granting such a right to corporations, as imposed by LSA-C.C. art. 608, remains applicable in the present case.
A review of the articles in the Civil Code addressed to “uses” and “rights of habitation” reveals the following:
“Use is the right given to any one to make a gratuitous use of a thing belonging to another, or to exact such a portion of the fruit it produces, as is necessary for his personal wants and those of his family.” LSA-C.C. art. 626.
“That which distinguishes the usufruct of a property from the use of it, is this, that the enjoyment of the usufructuary is not confined to what is necessary for his consumption, but he takes all the fruits, and can dispose of them as he pleases.
“The person, on the other hand, who has only the use of an estate, has a right only to such fruits as may be necessary for his daily wants and those of his family-
“But he may claim so much of those fruits as may be necessary to supply the wants of the woman he has married, and of his children born since the use has been granted to him.” LSA-C.C. art. 633.
“The right of habitation is the right of dwelling gratuitously in a house the property of another person.” LSA-C.C. art. 627.
“He who has a right to habitation in a house may reside there with his family, though he may not have been married at the time this right was granted to him.” LSA-C.C. art. 640.
“The word family, made use of in this chapter, is to be understood of the wife, children and servants of the person to whom the right of use or habitation is granted.” LSA-C.C. art 642.
Planiol also states in his treatise, regarding the right of use:
“Use is a real right of the same nature as usufruct. It however is of lesser extent. Of the two elements that make up usufruct, the right to use and the right to receive the fruits, use included formerly but the first. The Romans therefore called it nudus usus, id est sine fructu. *462 Nevertheless, as will be seen, a limited right to the fruits is added.” Definition, Section 2871.
“Strictly speaking, the user should have no right to the fruits of the thing when it is fruit-bearing. But the Roman juris-consults had been forced to add somewhat to the rights of the user in cases where the mere use of the thing would have given him but an insignificant profit. The user of a rural property was entitled to take from it a few minor products necessary for his subsistence: ‘Ut oleribus pomis, floribus, feno, stram-entis, lignis, ad usum cottidianum utatur' (Ulpien, Digest, Bk. VII, Tit. 8, fr. 12; Institutes of Justinian, Bk. II, Tit. 6, § 1). This equitable decision, retained by tradition in the old French Law, was preserved by the Code. Art. 630 permits the user to gather the fruits of the thing ‘to the extent that they may be necessary for his needs or those of his family.’ By ‘family’ is meant all who are supported by the user. This includes his spouse, his children and his servants. Usufruct therefore resembles usufruct more than its title would indicate. It is a little usufruct, limited to the user’s needs.” User’s Right to Fruits, Section 2872.
The rights contractually granted to the Daughters were extremely limited and were confined to plaintiff’s use of the lower floor of the Jackson House only for the purposes of exhibiting historical artifacts and holding meetings of the organization. There was certainly no right given to the society to extract any limited amounts of “fruits” as provided by LSA-C.C. art. 626 or to receive any fruits necessary for consumption by a user or his family, as provided by LSA-C.C. art. 633. This court cannot, therefore, find justification, on analysis of the “use” articles cited above, for characterizing the Daughters’ contractual rights as ones of use. Neither can we find that those rights, which were strictly limited, as stated previously, to use for meetings and exhibits, should be characterized as rights to “habitation,” which we interpret as granting a right of residence, and includes the obligee’s entire family, under LSA-C.C. arts. 627, 640 and 642.
It is our conclusion from a reading of the contract of sale and a review of the previously cited codal articles, as well as the civil law treatises quoted above, therefore, that it was not the intent of either of the parties to the contract of sale that the rights granted to the Daughters should be those of “usufruct,” “use” or “habitation” as used in the Louisiana Civil Code, and thereby subject to the 30-year limitation of LSA-C.C. art. 612. Due to the fact that the Daughters’ rights were very limited in scope and were to continue even in the event of destruction of the property, we. hold that the rights granted to the Daughters were nothing more than a contractual obligation incurred by the State and, consequently, not subject to the 30-year limitation imposed on uses, habitation and usufructs granted in favor of corporations.
Also in support of this interpretation is the fact of the historical significance of the Jackson House, precluding the likelihood of its subsequent sale by the State and therefore also precluding the probability that either party to the contract was concerned with protecting its rights in the event of such a future sale by way of stipulation which would attach to the property itself.
Although the State cites the case of Lasyone v. Emerson, 220 La. 951, 57 So.2d 906 (1952), in support of its proposition that the rights of the Daughters must be construed as a use or usufruct in the strict sense, we hold that case distinguishable on the facts. The deed in question in that case was stated at page 907:
“ ‘It is covenanted and agreed, and the vendor and vendee do by these presents covenant and agree, that the Vendee shall have the use, without rental, of the lower story of the two story brick building situated on said property, to assume the upkeep, repairs and improvements of said lower story as needed and as may be necessary for the operation of said business; to extend said lower story, without interference or hindrance to the second story of said building, back on said lot to *463 a distance of One Hundred feet which extended portion of said lower story shall be the individual property of said vendee.
“ ‘It is also covenanted and agreed, and vendor and vendee do by these presents covenant and agree, that the use, without rental, of the second story of said building shall be retained in the Vendor, who shall have the use of same for himself, or to lease, and to maintain the upkeep, repairs and improvements of same.
“ ‘The first or lower story of said building is understood to include from the ground to the second floor and the second story is understood to include from the second floor to the roof inclusive.
“ ‘The vendor also retains the stairway which is to remain intact and kept as means of ingress and egress to second story.’ ”
Obyiously the obligations of upkeep, repairs and improvements, and lack of any reference to any obligations not connected to the property itself (as is the situation in our present case) renders Lasyone, supra, distinguishable from this case. Moreover, the parties in Lasyone, supra, were not the original parties to the above-quoted deed but retained titled to the property through subsequent sales.
Had this court not arrived at the above conclusion, we would also have had to consider the doctrine of equitable estoppel, which is applicable to the state and its subdivisions as well as individuals. Prebensen & Blakstad v. Board of Commissioners, 241 F.Supp. 757 (U.S. Dist.Ct., E.D.La., 1965); State v. Register of State Land Office, 192 So. 519 (La.1939). It is obvious to this court that the State’s voluntary conduct in promising the Daughters use of the lower floor of the Jackson House was justifiably relied on by the Daughters and that' they changed their position, i. e, gave up ownership of the property in reliance upon the State’s promise of the availability of the property for their continuing use, thereby bringing into play the principles of this doctrine and precluding the State from now asserting a bar to performance of their obligation. Prebensen, supra.
From a review of the testimony in the district court given by the chairman of the Louisiana State Museum Board; by the director of the Louisiana State Museum and the assistant secretary for the Office of Culture, Recreation and Tourism of the State of Louisiana, as well as that of several members of the Daughters, who had witnessed the moves of the organization in and out of the Jackson House over the years; and from a reading of the various letters of correspondence written and received by the Daughters, it is also apparent that the only periods the Daughters did not avail themselves of their contractual right to use the Jackson House were those times when the State asked them to abandon the premises for necessary reconstruction, renovation or repairs. It is not demonstrated at the trial, therefore, that the Daughters in any way violated the conditions of use granted to them, nor was it demonstrated that they were ever put in default for any such violation. Neither can we find merit, therefore, to any argument that the Daughters’ rights expired through nonuse; however, this court need not decide that issue since we have determined that the rights granted the Daughters are conventional obligations rather than a use, usufruct or habitation.
For the reasons assigned, the trial court judgment maintaining the defendant’s exception of no cause of action is reversed and judgment is hereby granted in favor of plaintiff, United States Daughters of 1812 —Chalmette Chapter, declaring that they are entitled to use of the ground floor of the Jackson House, subject only to the limitations and obligations imposed upon them by the contract granting them that right. All costs are to be paid by defendant.

REVERSED AND RENDERED.